## HOUGHTON v. THOMPSON ET AL.

(No. 2191; July 29, 1941; 115 Pac. (2d) 654)

For the appellant there was a brief and oral argument by *James A. Greenwood* of Cheyenne.

198

For the respondents, there was a brief by *E. E. Enterline* and *Madge Enterline* of Casper, *T. C. Daniels* of Douglas, and *Thomas O. Miller* of Lusk, and oral arguments by *Messrs. Daniels* and *Enterline*.

200

Kimball, Justice.

This is an appeal in an action based on a contract to convey an interest in oil and gas produced from a 320-acre tract of land in the Lance Creek oil field. The relief demanded was specific performance of the contract, and recovery of accumulated royalty. The plaintiff and appellant is Grant S. Houghton, acting as trustee for himself and others who are described as his associates. The contract is evidenced by a writing, dated July 24, 1926, signed by plaintiff, Frank H. Thompson and Christina Thompson. The Thompsons were husband and wife. The husband died in 1927 and his widow, who became the owner of all property of his estate, is the interested defendant. The other defendant, Minnelusa Oil Corporation, is a mere stakeholder, and when we speak of "defendant" we mean Mrs. Thompson. The judgment of the trial court was for defendant on a general finding, and plaintiff appeals.

The writing of July 24, 1926, will usually be called "the 2% agreement." After reciting the date and the parties, the Thompsons as first parties and the plaintiff as second party, it is as follows (paragraphs being numbered for convenience in reference) :

(1) "WHEREAS, on or about the 19th day of December, A. D. 1918, first parties hereto did, by proper

deed, convey to second party, as trustee, for himself and others, those certain lands as are hereinafter described and in such conveyance did reserve twelve and a half per cent of all petroleum oil or gas produced and saved on or under the said premises, and

(2) "WHEREAS, first parties hereto did thereafter by assignment convey a three and a half per cent out of such reservation so that the same at this time amounts to nine per cent only;

(3) "WHEREAS, first parties hereto are desirous that said land be drilled so that the oil and gas value thereof might be proven and to that end have interested one Richard L. Bryner of San Francisco in drilling the same and are anxious and desirous that second party make an arrangement and agreement with the said Bryner to drill the said lands and have agreed that in the event such arrangement or agreement is made they will convey to second party a two per cent interest in the said lands out of their remaining nine per cent, under the conditions as hereinafter expressed, and desire by this instrument to conclude and express such agreement.

(4) "NOW, THEREFORE, in consideration of the premises and of the mutual agreements hereinafter mentioned to be kept and performed by the respective parties hereto they agree with each others as follows:

(5) "Second party hereto agrees to arrange with and enter into a drilling contract relating to those certain lands located in Niobrara County, Wyoming, described as follows, to-wit: (here the 320-acre tract of land is described)

(6) "First parties hereto agree that after such arrangement and contract or lease for the drilling of said lands is entered into and the same is drilled, in the event production of petroleum oil, gas or other hydro carbons is thereon encountered, that at such time as Two Percent of first parties' interest in said lands has earned the sum of Four Thousand Dollars ($4,000.00) then first parties hereto will convey by a proper deed of conveyance Two Per Cent of such production, it being meant by this that the Two Per Cent to be conveyed shall be Two Per Cent of all of the production so that the remainder of first parties' interest in said

lands shall amount to Seven Per Cent instead of Nine Per Cent.

(7) "It is further understood and agreed by and between the parties hereto that at the time of said conveyance or at the time second party hereto is entitled to such conveyance second party hereto shall be entitled to receive all money from the sale of such oil, gas or other hydro carbons as are produced and saved from said lands, and

(8) "It is further agreed by and between the parties hereto that in order to facilitate the determination of the exact time when second party is entitled to such conveyance first parties hereto will render to second party from time to time as called upon to do so a statement in detail showing the dates and amounts of any receipts by him from production from said lands."

To understand the situation of the parties and the purpose and setting of the 2% agreement it is necessary to notice previous and contemporaneous transactions shown by undisputed evidence.

Paragraph (1) of the 2% agreement refers to a deed which we shall call the "deed of 1918," from the Thompsons to plaintiff, conveying the 320-acre tract. In respect to the minerals in the land there was a reservation or exception stated in the deed as follows: "It is hereby agreed to and between the parties hereto that the said grantors, Frank H. Thompson and Christina J. Thompson reserve unto themselves twelve and one half (12½) per cent of all oil, gas and casing head gas found and taken from said lands, to be delivered to them on the land, in pipes running said oil and gas. It is further agreed that said Grant S. Houghton, grantee, herein shall begin active drilling operations on said land to develop same for oil and gas not later than May 1st, 1919 and continue diligently the work of developing said land until production is secured or the land proven to be non-productive."

It is to be inferred that plaintiff and his associates have not attempted to drill on the land at their own

expense, but have expected to act through lessees. The only evidence of drilling operations between 1918 and 1927, is that the Texas Company, at some time not definitely shown, drilled a well to the depth of 3250 feet, but made no discovery of mineral.

On July 24, 1926, plaintiff, Frank H. Thompson and Richard L. Bryner called at the office of an attorney at law who then prepared the 2% agreement and three other writings that we shall call, respectively, the "99-year lease," the "3½ assignment" and the "Bryner lease." Though all these writings were not signed or delivered on the same day, they may be treated as contemporaneous instruments for the purposes of the case.

The 99-year lease is by plaintiff, lessor, to Frank H. Thompson, lessee, of the surface of the 320-acre tract previously conveyed to plaintiff by the deed of 1918. The lease recites a consideration of "one dollar and other valuable consideration in hand paid receipt of which is hereby acknowledged and confessed, and the covenants and agreements herein expressed on the part of the second party, the lessee, to be kept, performed and fulfilled." The lessee agreed to pay the taxes on the land. It was also agreed that the lease was of the surface for agricultural purposes only, and that it was subject to any oil and gas lease by the lessor as trustee.

The 3½% assignment is a conveyance, for the stated consideration of "one dollar and other valuable consideration," by the Thompsons to plaintiff to "all their right, title and interest in and to 3½% of all oil, gas and casing head gas found and taken from" the 320-acre tract. This instrument is dated July 30, 1926, evidently because it was signed and acknowledged by the Thompsons on that day. It is referred to as a past transaction in paragraph (2) of the 2% agreement.

The Bryner lease, dated July 24, 1926, was an oil and gas lease of the land to Richard L. Bryner, lessee, as

contemplated by the parties to the 2% agreement. The lessors were plaintiff, the Thompsons, and John E. Schuricht and wife; the cash consideration was $1.00; the term 5 years and as long thereafter as oil and gas should be produced by the lessee in commercial quantities; the royalty was 15% of oil produced and of the net proceeds of gas produced and sold. The lessee agreed, among other things, to commence drilling within 90 days, but had the right to surrender the lease at any time by payment of $1.00 and the delivery of a written release.

It may be that plaintiff is correct in saying that he was the only necessary lessor, but it was evidently thought that all persons interested in the oil and gas to be produced from the land should join as lessors. The Schurichts it seems had a 2½% interest they had obtained from the Thompsons. The respective interests in the oil produced under the lease at the outset were: the lessee 85%; the plaintiff 6%; the Thompsons 6½%, and the Schurichts 2½%.

Drilling operations under the Bryner lease were by Indian Petroleum Corp., lessee by assignment. Oil was produced from a well drilled to a depth of 3700 feet, but production fell away until it finally ceased in November, 1930. Thereafter the well was plugged and abandoned, and in 1933 the lease was formally surrendered. The royalty paid defendant from oil produced under the lease included $1135, earned by the 2% interest in question.

From November, 1930, until the spring of 1935 there was no drilling activity in that part of the Lance Creek field. In 1935, however, interest in the field was revived by the finding of oil in the Sundance sand at the depth of about 4000 feet. Plaintiff testified that he was "contacted" by six or eight persons or companies who desired to obtain the right to drill on the land. A Mr. Donoghue was given an option for a lease on the basis

of a 17½% royalty and an $8000 bonus, but the option was not exercised, and the record does not show what was paid for it. Finally a lease that we shall call the "Huber lease" was given.

The Huber lease, dated March 18, 1936, was from plaintiff and defendant, lessors to the J. M. Huber Corporation, lessee. The recited consideration was $1000 cash and the covenants and agreements of the parties. There was a provision for certain "bonus" money up to $7000, to be paid by the lessee, contingent on the amount of oil produced from the first well. The royalty was 15% of all oil produced and of the net proceeds received from sale of gas. The lease did not undertake to say how the payments by the lessee were to be divided between plaintiff and defendant, but on the same day, March 18, 1936, the parties to the lease signed a writing, headed "contract," wherein the lessors are described as parties of the first part and the lessee as party of the second part. This writing, which probably should be called a division order, recites the making of the lease and that "royalty payments due under the terms and conditions of said oil and gas lease are hereby declared by the parties of the first part to be divisible between them as follows: To the undersigned Christina J. Thompson, 6½% of said royalty; to the undersigned Grant Houghton, Trustee, 6% of said royalty." It was further declared that the other 2½% royalty (the interest transferred by the Thompsons to the Schurichts in 1926) should be deposited in a bank to be held until there was a judicial determination of the right thereto. This interest is not involved in the present action.

Drilling operations that resulted in production of oil and payment of royalty under the Huber lease by the lessee and its assignees, were commenced in 1936. The last assignment of the lease was February 15, 1938, to the Minnelusa Oil Corporation, and about that time

plaintiff and defendant and other parties interested in production under the lease, made another division order, effective February 23, 1938, wherein the plaintiff's interest was listed as 6½% and defendant's as 6%. Evidently, since the making of the division order of March 18, 1936, plaintiff's interest had been increased, defendant's decreased, by ½% not in question in this action.

By May, 1938, the 2% interest in question had earned for defendant out of production under the Huber lease an amount which, together with the $1135 earned under the Bryner lease, exceeded $4000. Thereafter, on July 11, 1938, plaintiff demanded of defendant a conveyance of the interest, and on her refusal to convey this action was brought.

The defenses were, first, that the consideration for the Thompsons' promise was insufficient; second, that the promise was conditional and, as the condition was not satisfied, the promise calls for no performance, and, third, that the result of performance would be inequitable. The second defense raises the main issue in the case, but we shall first say something on the question of consideration. The third defense need not be discussed.

In support of the defense of insufficiency of consideration, defendant contends that the only consideration for the Thompsons' promise in the 2% agreement was the signing by plaintiff of the Bryner lease; that plaintiff was already bound to develop the land for oil and gas for the benefit of the Thompsons as provided in the deed of 1918, and that by making the Bryner lease the plaintiff suffered no detriment and the Thompsons received no benefit. See Williston on Contracts, § 130.

We think it is true that the signing of the Bryner lease by plaintiff was the sole consideration for the Thompsons' promise to convey the 2% interest. That was the consideration recited rather carefully in para-

graph (3) of the 2% agreement. If there was an additional consideration provable under the parol evidence rule, plaintiff had the burden of proving it. When defendant as a witness was asked whether she received any consideration for the 2% agreement other than what the agreement itself recites, plaintiff objected on the ground that it was an attempt to show something that the agreement does not recite, and the objection was sustained on that ground. Plaintiff contends, however, that the 99-year lease was the consideration for both the 3½% assignment and the 2% agreement, but this does not find support in any recital in the writings, or any extrinsic evidence. The sole basis for the contention is that the several writings were contemporaneous. See, Frank v. Stratford-Handcock, 13 Wyo. 37, 62-63, 77 P. 134, 140. It is argued that the four writings prepared July 24, 1926, were parts of a "single deal," and authorities are cited in support of the rule that all writings forming part of the same transaction are interpreted together. See Restatement of Contracts, § 235(c); Huyler's v. Ritz-Carlton etc. Co., 1 F. (2d) 491. We may concede that the four writings were parts of the same transaction within the mentioned rule of interpretation, but we cannot see that that is important on the question under discussion. The part of the transaction that led to the making of the Bryner lease and the conditional promise to convey the 2% interest is the subject of a separate contract evidenced by a separate writing which by its terms shows the intention of the parties that the promise on the one side to make the lease was set off as the agreed exchange for the conditional promise on the other side. The other writings contain nothing to show a different intention. The attorney who prepared the writings was a witness at the trial, and in answering a question about the delivery of the papers said he was acting for the "gentlemen who had made the deal." Though plain-

tiff relies on this statement as tending to show a single, indivisible contract, he insists that less doubtful testimony on the subject by the same witness should be rejected as a legal conclusion. The witness, when asked whether the 99-year lease and the 3½% assignment on the one hand, and the 2% agreement and Bryner lease on the other, were two separate and distinct deals, answered: "They, in a way, had a different subject matter and as I understood it then and as I understand it now one was not dependent on the other." The plaintiff cannot consistently object to this answer and at the same time rely on other testimony which he interprets as an opinion that there was a single deal.

As shown by the deed of 1918, plaintiff was under an obligation to develop the land for oil and gas for the benefit of the Thompsons, and it may be assumed that the interested parties intended all along that the promised development would be effected by drilling done by lessees under oil and gas leases. The making of the Bryner lease was an act of the kind that was necessary in the process of development. Does it follow that the making of the lease was no detriment to plaintiff and no benefit to the Thompsons? It may be true that the making of the lease and the operations under it caused no actual loss to plaintiff and no actual gain to the Thompsons. There was no evidence that plaintiff was deprived of an opportunity to make any better or different arrangement for drilling on the land, or that the Thompsons received more than they were entitled to receive under the deed of 1918. But detriment and benefit in this connection have a technical meaning. Neither need be actual. Williston on Contracts, § 102A. The consideration given by the promisee need not move to the promisor, but may move to some one else at the request of the promisor. Williston, supra, § 113. It is said that a promise is binding if given in consideration of the promisee doing in a particular way something

which otherwise he must do, but has the choice of doing in more than one way. Pollock on Contract, (10th ed.) p. 182. And see Restatement of Contracts, § 84(c). Plaintiff was not by the deed of 1918 bound to develop the land in a particular way. He was not bound to make a lease with Bryner, and made it on the request of the Thompsons. Bryner, at least, received a legal benefit.

The basic question in the case is the meaning of the conditional promise of the Thompsons as stated in the 2% agreement. Plaintiff says the promise was to convey the 2% interest if and when it earned $4000 from production under any arrangement plaintiff might make for the drilling of the lands. Defendant says the promise was to convey the interest if and when it earned $4000 from production under the Bryner lease. If plaintiff is correct, the condition was satisfied in May, 1938, when the amount earned by the 2% interest reached $4000, from production under the Huber lease. If defendant is correct, the condition was not satisfied, and the conditional promise does not call for performance. Williston, supra, § 112.

In interpreting the contract we should consider not only the terms of the writing, but also the surrounding circumstances—attendant facts showing the relations of the parties, the nature and situation of the subject matter and the apparent purpose of making the contract. Snow v. Duxstad, 23 Wyo. 82, 121, 147 P. 174, 184; Pacific-Wyoming Oil Co. v. Carter Oil Co., 31 Wyo. 314, 327, 226 P. 193, 197.

We look first to the terms of the writing. The condition limiting the Thompsons' promise to convey is described in paragraph (6) of the 2% agreement as a series of events. There must be drilling. Performance is promised after the lease is entered into "and the same is drilled." There must be production. The promise is "in the event" oil or gas is encountered. There

must be sufficient production. Performance is due "at such time" as the 2% interest has earned $4000 from production. The property right to be conveyed is described as 2% of "such production." All these provisions are contained in the same sentence.

When the writing, in stating the conditional promise, refers to drilling and the encountering of oil or gas, there can be little doubt that it meant drilling and production under the Bryner lease. This is the natural and reasonable meaning. The making of the lease would result in no actual benefit to either plaintiff or the Thompsons unless there was drilling followed by production under the lease. If the lessee had failed to drill or had failed to find oil, and the lease had been forfeited or surrendered, the plaintiff and the Thompsons would have been left just as they were before the lease and the 2% agreement were made. After referring to drilling and production under the Bryner lease the description of the conditional promise continues by stating in the same sentence the amount that would have to be earned from production to satisfy the condition. We believe that if the parties had intended that the condition would be satisfied by production wholly or in part from operations under some future drilling arrangement, they would have put something in the writing to show that the production first mentioned, that must be encountered by drilling under the Bryner lease, was not the production in mind in stating the amount to be earned.

We hold above that the sole consideration for the Thompsons' conditional promise was the making by plaintiff of the Bryner lease. If the consideration had been a promise by plaintiff to continue development under any future arrangement he might make, it probably would be necessary to hold that the promise was a mere repetition of his promise under the deed of 1918, and not a sufficient consideration. His only justi-

fication for exacting the promise in consideration of the making of the Bryner lease was that he was not bound to make that particular lease. He did not promise to make any future lease. The parties knew that if the Bryner lease were surrendered (as in the sequel it was) before the 2% interest in question had earned $4000, a continuance of development would require the making of a new lease, a contingency not even mentioned in the 2% agreement. If a proposed new lease should not meet the approval of plaintiff, he might still feel free to dicker about making it as he did about making the Bryner lease. If, however, the new lease, because of changed conditions or for some other reason, should be more favorable, plaintiff, without exacting any further consideration, might be willing to make it in performance of his promise shown by the deed of 1918. As it happened, the new lease was made under conditions materially changed by the discovery of oil in the Sundance sand, and the lease on its face at least was in some respects more favorable, calling for a cash payment of $1000, and a possible bonus of $7000.

In the 2% agreement the Thompsons expressed their desire to have the lands drilled under a lease of even date, which in fact had been signed by plaintiff and Bryner before the 2% agreement was signed by the Thompsons. The Thompsons already had plaintiff's promise to develop the property, but they were anxious to pave the way for prompt drilling under a present lease, and in order to do so were willing to make the conditional promise to convey a substantial part of their interest in production. We think the writing meant that the plaintiff would be entitled to the 2% interest if it earned $4000 for the Thompsons from production under the lease then bargained for.

Plaintiff says that defendant gave no warning of her intention to refuse to convey the 2% interest until after the making of the Huber lease and the receipt by

her of the full $4000. This statement is not supported by the record for it disregards testimony that the trial judge may have believed. There was testimony that in the fall of 1935 or spring of 1936, before the making of the Huber lease, plaintiff told defendant that his associates wanted to know if she would make the same kind of agreement on the Huber lease that her husband had made on the Bryner lease for the 2% interest, and she said she would not. Plaintiff denied having the conversation, and testified that there was no conversation between him and defendant about the 2% agreement until July 11, 1938, when he made demand for a conveyance. The division orders of March 18, 1936 and February 23, 1938, signed by both plaintiff and defendant, made no mention of a possibility that their respective interests in production would be changed because of the 2% agreement. We do not discuss the weight of this evidence. It shows, at least, that if either party is open to the charge of inconsistency because of what was said or done in connection with the Huber lease, it is the plaintiff and not the defendant.

The judgment will be affirmed.

RINER, Ch. J., and BLUME, J., concur.