Cecil MILLER, Appellant (Third-Party Defendant),

v.

G.O. MILLER, Vivian Miller Hytrek and Cecil Miller, Executors of the Estate of Freda Miller, Deceased, Probate No. 6–34, Platte County, Wyoming, Appellees (Defendants and Third-Party Plaintiffs),

v.

FIRST NATIONAL BANK IN WHEATLAND, (Plaintiff).

No. 5836.

Supreme Court of Wyoming.

May 20, 1983.

Rehearing Denied June 7, 1983.

D.N. Sherard and Rex E. Johnson, Wheatland, for appellant.

William R. Jones and John P. McBride of Jones, Jones, Vines & Hunkins, Wheatland, for appellees.

Before ROONEY, C.J., and RAPER, THOMAS, ROSE and BROWN, JJ.

BROWN, Justice.

The First National Bank in Wheatland filed suit against the estate of Freda Miller, deceased. The amended complaint alleged that G.O. Miller, Vivian Miller Hytrek, and Cecil Miller, as executors of the estate, owed payment on a promissory note executed by Freda Miller. The defendants, appellees herein, confessed judgment on the note and proceeded to trial on an amended third-party complaint against appellant Cecil Miller, contending that the obligation was his. The district court ruled in favor of appellees. Although appellant urges five issues on appeal, we need only address the issue of whether the evidence was sufficient to support the judgment.

We reverse.

On January 27, 1966, appellant and his wife entered into a real estate contract with his mother, Freda Miller, which provided that appellant buy the family farm. The purchase price was $75,000; purchasers also assumed a mortgage to Travelers Insurance Company of approximately $82,000. The $75,000 due Freda Miller was to be paid in 30 years at $2,500 each year and was not to bear interest.

On April 17, 1978, Freda Miller and appellant co-signed a promissory note for $60,000 to the First National Bank in Wheatland. The loan proceeds went to appellant. On June 14, 1978, Freda Miller, appellant and his wife refinanced the farm through Travelers Insurance Company and increased the mortgage to Travelers to $210,000. The proceeds which resulted from this refinancing, $91,823.67, went from Travelers Insurance Company to Freda Miller. On July 14, 1978, she paid in full the April 17, 1978, note to the First National Bank in Wheatland.

On October 31, 1978, Freda Miller executed a promissory note for $60,000 in favor of First National Bank in Wheatland. This loan was to purchase a modular home for Freda Miller. The October 31, 1978, promissory note is the note sued on by the bank against appellees.

On November 3, 1978, appellant, his wife and their son entered into a contract with Freda Miller. They agreed to assume the $210,000 Travelers Insurance Company loan, and to pay Freda Miller $100,000 in installments without interest. Freda Miller died around the middle of November, 1978.[1]

The court below and the lawyers had difficulty sorting out the legal ramifications of the dealings between mother and son. We cannot say that we fully understand what went on between them or what their intentions were. We can say, however, that appellees did not show the existence of a contract between Cecil Miller and Freda Miller wherein Cecil Miller legally obligated himself to pay his mother the $60,000 which she owed the bank for the October 31, 1978, promissory note.

It is well established that an offer, acceptance, and consideration are the basic elements of a contract. The burden of proving a contract is on the one seeking to recover on it. *Black & Yates, Inc. v. Negros-Philippine Lumber Company,* 32 Wyo. 248, 231 P. 398 (1924). This includes the burden of proving consideration. *Houghton v. Thompson,* 57 Wyo. 196, 115 P.2d 654 (1941).[2]

" * * * Consideration is a necessary element for a valid agreement and the burden of showing it is on the one claiming the benefit of the agreement. Lack of consideration to support the agreement would be a failure of that party's burden * * *." *Ennis v. McLaggan,* Mo.App., 608 S.W.2d 557, 561 (1980).

A generally accepted definition of consideration is that a legal detriment has been

1. After Freda Miller's death, appellant purported to renew the October 31, 1978, note several times on behalf of the estate. We do not attach any significance to this. Appellant did not have any authority to renew the note. His attempts to renew do not show that appellant recognized any personal responsibility for the note, as appellees contend. If it shows anything, it shows the contrary.

2. This case discussed proving additional consideration beyond what was recited in the contract. The same logic applies to the proof of consideration for an oral contract.

bargained for and exchanged for a promise. *Higgins v. Monroe Evening News,* 404 Mich. 1, 272 N.W.2d 537 (1978). The Restatement of Contracts says that a performance or a returned promise must be bargained for. " * * * The performance may consist of an act, other than a promise, or a forbearance, or the creation, modification or destruction of a legal relation." Restatement of Contracts (Second), § 71, p. 172 (1981). Lack of consideration goes to the validity of contract formation. Absent some indicia of actual consideration, a contract will be held invalid by the courts.

"For several centuries, it has been customary to say by the common law that no informal promise is enforceable if it is without consideration. * * * " 1 Corbin on Contracts, § 110, p. 491 (1963 Replacement).

 The question whether an oral contract exists is one of fact. *Jim's Water Service, Inc. v. Alinen,* Wyo., 608 P.2d 667 (1980). Nevertheless, as with any question of fact, the decision of the finder of fact will be reversed if there is little or no evidence to support the finding. *Alco of Wyoming v. Baker,* Wyo., 651 P.2d 266 (1982). Appellees failed to prove that there was any consideration for appellant's alleged promise to pay.

 The theory of appellees' original third-party complaint against appellant was that the promissory note of October 31, 1978, was really his debt, and that he received the benefits from that promissory note, and that he had agreed to pay it. Appellees then changed the theory of their suit against appellant, and amended the third-party complaint to allege that appellant was indebted to Freda Miller because of the

April 17, 1978, promissory note and because appellant received the proceeds from the loan. Appellees further alleged that because of the April 17, 1978, indebtedness, appellant agreed to pay the October 31 promissory note signed by Freda Miller.[3]

The record does not support their allegations. The testimony was that when appellant, his wife, and his mother refinanced the farm with Travelers Insurance on June 14, 1978, approximately $125,000 was used to pay off an old mortgage to Travelers, and approximately $91,000 remained. Appellant testified that he turned the $91,000 over to his mother to repay the $60,000 note, which would have to be the April 17, 1978, note that they co-signed. Appellant then testified that he entered into a contract on November 3, 1978, with Freda Miller, partly because he wanted to have his son added to the contract, and partly because he wanted to assume in writing the Travelers' loan of June 14, 1978.

 Appellees contended that appellant entered into the November 3, 1978, contract because it covered different land than the 1966 contract. The proof was apparently presented to show that appellant received more value from Freda Miller than he had agreed to pay for in formal contracts, and that therefore he must have intended and agreed to pay the $60,000 note for the modular home to the bank to even things out between his mother and himself. Appellees seem to be arguing that appellant had a motive for offering to pay the note on the modular home, but evidence of motive does not substitute the necessary element of consideration in a contract. *Ag-*

---

**3.** The amended third-party complaint against appellant also alleged a loan of $15,000 and a loan of $10,000 made by Freda Miller to appellant. The trial court found the $15,000 item to be a gift. This determination was not appealed. Appellant acknowledges that the $10,000 item is a debt that he owed his mother. Therefore, we need not consider either the $15,000 or the $10,000 in this appeal.

Appellant counterclaimed, alleging that the estate owed him $30,000, which was the money that Freda Miller kept from refinancing the

loan with Travelers, after she had paid off the April 17, 1978, note to the bank. Appellant testified, however, that he felt Freda Miller was entitled to more than the $60,000 for what she had done for appellant over the years. This seems to take care of appellant's counterclaim. The judgment, in the absence of special findings of fact, carries with it every finding of fact which is supported by the evidence. In this case an implied finding that appellant is not entitled to recover on his counterclaim is supported by the evidence.

*new v. Brown,* 96 Ill.App.3d 904, 52 Ill.Dec. 430, 422 N.E.2d 111 (1981). Perhaps appellant had a moral obligation to pay the note, but moral obligation alone is not a valid consideration for a promise to pay. *Matter of Estate of Voight,* 95 N.M. 625, 624 P.2d 1022 (1981). A moral obligation is not necessarily a legal one. *Wantulok v. Wantulok,* 67 Wyo. 22, 214 P.2d 477, 21 A.L.R.2d 572 (1950).

Appellant did tell his mother and others that he would pay off the October 31, 1978, loan, if and when he could. Appellees argue that this statement by appellant that he would pay the note shows a contract. However, "the mere fact that one man promises something to another creates no legal duty and makes no legal remedy available in case of non-performance." 1 Corbin on Contracts, supra, at p. 490. Further, appellant testified, and the testimony was uncontradicted, that he expected to receive a deduction on the November, 1978, contract with Freda Miller.

Appellees also argue that their mother understood that she and appellant had a contract. On or about November 10, 1978, Freda Miller gave a daughter a memo in her handwriting:

"Land payment from Cecil
"91,823.67 27 June 1978
"61,446.58 7–14 1978
"10,000 7–5 Cecil borrow from me Freda
 Miller

"$60,000—

**4.** The only evidence in the record that Freda Miller might have incurred a detriment was Cecil's testimony that he made the promise because he expected to receive a deduction on the debt to his mother on the November 3, 1978, contract. Because the estate is going to suffer from receiving no interest on the November 3, 1978, contract, perhaps appellant has a moral obligation to pay the October 31, 1978, note in exchange for a deduction on the November 3, 1978, contract.

**5.** In January, 1966, at the time of the first contract between appellant and his mother, the amount due on the Travelers Insurance Company loan, assumed by appellant, was about $82,000. In 1978, when appellant and his mother refinanced, the balance due on the Travelers loan was about $125,000, notwithstanding appellant had paid Travelers Insurance Company in excess of $230,000 between 1966 and

This money—I Freda Miller Borrow From First National Bank Oct 31, 1978 which Cecil is to pay April 30, 1979. The money was Borrowed to paid [sic] for the Modular house"

█ This handwritten memo later became Exhibit I at trial, over appellant's objection. The memo might show Freda Miller's understanding, although it is unclear, but that is not enough to prove a contract. There must still be some consideration. In this case, there was no detriment to Freda Miller which she was to incur as a result of her son's promise.[4] The fact that she had already paid a note to the bank, the total amount of which she was legally responsible for, was no detriment. Doing anything beyond what one is already bound to do can be good consideration for another's promise. *Long v. Forbes,* 58 Wyo. 533, 136 P.2d 242, 158 A.L.R. 224 (1943). However, Freda Miller did not do anything beyond what she was already bound to do.

The financial transactions between appellant and his mother are typical parent-child dealings, that is to say, documentation of financial matters is sparse and inadequate. Mother's and son's dealings with each other were casual and informal, based mostly on mutual trust rather than contract. Many things were done orally outside the terms of the contracts; others were done that were not provided for in the contracts. For the most part, the contracts were ignored.[5]

1978. Appellant says he paid about $190,000; however, the cancelled checks show $232,740.07, but what is $40,000 between a borrower and his lender? Appellant explains this by testifying that between 1966 and 1978 other monies had been borrowed from Travelers.

The contract between appellant and his mother provided that a warranty deed be delivered to appellant (the contract does not say when); however, when the loan with Travelers was refinanced in 1978, Freda Miller signed as a mortgagor. We do not know the reasons for appellant entering into the second contract of November 3, 1978, with his mother. The second contract does not include any new land and describes less land than the first contract. Furthermore, although appellant claims that he made all the payments due his mother under the first contract dated January 27, 1966, he entered into the second contract and agreed to

Appellees will probably remain convinced that they should be paid. Nevertheless, they failed to meet their burden of proof; perhaps, because of the confused state of affairs, they never could. Regardless, this court will not find a contract where one has not been proved to exist.

Reversed and remanded for entry of an order consistent with this opinion.

pay her $18,000 more than he agreed to pay her twelve years before.

The second contract does not say what relationship it bears to the first. Does it amend the first? If so, appellant is getting less land. If it is entirely independent of the first contract, then appellant is paying twice for the same land. Appellant answered that the first contract was still in effect although modified. If that is so, does he owe his mother, now the estate, under both contracts?