TRANSAMERICA COMMERCIAL FINANCE CORPORATION, a Corporation, Appellant (Plaintiff),

v.

**Linda NAEF, Appellee (Defendant).**

No. 91–246.

Supreme Court of Wyoming.

Nov. 30, 1992.

**540**

Bret F. King and David Wallick (argued), of King & King, Jackson, for appellant.

Kenneth S. Cohen (argued), Jackson, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT * and GOLDEN, JJ.

CARDINE, Justice.

Appellant Transamerica Commercial Finance Corporation (Transamerica) seeks to recover from appellee Linda Naef sums due under a promissory note she and her husband signed in an attempt to save his business. Since we agree with the trial court that no consideration was given for Mrs. Naef's signature on either the note or the loan guarantee she signed, and since Mrs. Naef cannot be considered an accommodation party on either document or a co-maker on the note, we affirm the trial court's judgment for appellee and dismissal of Transamerica's complaint.

Appellant states the issues as follows:

I.   Whether the district court committed reversible error by not giving effect to the plain language of the guaranty and waiver, executed on October 20, 1989, by the appellee Linda Naef.

II.   Whether the district court committed reversible error by refusing to apply the law of accommodation parties.

III.   Whether the district court's factual finding that appellee Linda Naef was not part of the "original transaction" was contrary to the great weight of the evidence.

Richard Naef owned a snowmobile repair facility called Teton Power Products. In March or April of 1988, he purchased Weeks Motor Sports, a snowmobile dealership, from Ray Weeks. As part of the sale, Ray Weeks agreed to transfer to Mr. Naef his right to sell Yamaha and Polaris snowmobiles and to assist Mr. Naef in getting the franchise agreements with Yamaha and Polaris transferred to Mr. Naef.

Rich Poll, a Polaris representative, told Mr. Naef that it would be very difficult to get the Polaris franchise transferred immediately. He recommended that Mr. Naef operate the franchise he had purchased under the Weeks Motor Sports name for awhile until he had established a "proven track record." Mr. Naef did so, prosperously, from the spring of 1988 until the summer of 1989.

In April of 1989, Mr. Naef was given forms to fill out for a Polaris franchise. These forms included paperwork for financing snowmobile purchases through Transamerica.[1] He applied for a franchise

---

* Chief Justice at time of oral argument.

1. Both the Assumption Agreement and the Guaranty Mr. Naef subsequently signed were made in favor of Borg–Warner Acceptance Corporation, Transamerica's predecessor in interest. For purposes of clarity, we refer only to Transamerica in this opinion.

in May in the name of Teton Power Products. Mr. Poll told him during the summer that "everything looked pretty good" and "approval was there."

In June 1989, Teton Power Products reaffirmed Weeks Motor Sports' previous order of close to one hundred snow machines. These machines were financed by Transamerica. They began arriving in August 1989.

Richard Naef married Linda Naef on September 29, 1989. Linda Naef testified that she was not aware that Mr. Naef owned Teton Power Products when they married. On October 20, 1989, Rich Poll brought the documents for the Polaris franchise for Richard Naef to sign. Richard Naef mentioned to Mr. Poll that he had recently married. Mr. Poll told Mr. Naef that it was "absolutely necessary" for Mrs. Naef, as well as himself, to sign the dealership agreement. Both Richard and Linda Naef signed a loan guaranty making each of them personally liable for moneys Transamerica advanced to Teton Power Products.

The terms of Teton Power's agreement with Transamerica required Teton Power to remit the amount owed on each snowmobile when it was sold. The managers Richard Naef hired to run his business sold several snowmobiles for Christmas delivery but did not remit the moneys they received into an account Mr. Naef had established for paying Transamerica. As a result, two checks written from that account to Transamerica were returned for insufficient funds. By borrowing money, Richard and Linda Naef were able to cover most of what was due Transamerica. In order to keep the business open, they both signed a promissory note payable to Transamerica for around $41,000.00. Mr. Wood, a manager for Transamerica, told the Naefs that it was "imperative" that Mrs. Naef sign the promissory note in addition to Mr. Naef.

The next day, after inducing Linda to sign a note to keep the business open, Transamerica repossessed the remaining snowmobiles in Teton Power Products' inventory, thus closing out the business. Mr.

Wood called Polaris and told them what he had done; as a result, Polaris canceled Teton Power's franchise. Teton Power Products went out of business. The note to Transamerica remained mostly unpaid.

On June 12, 1990, Transamerica sued Teton Power Products, Richard Naef and Linda Naef for the amounts still due on the note, plus interest due, and for unpaid interest due under the original security agreement. Both Teton Power Products and Richard Naef filed for bankruptcy protection shortly thereafter. Transamerica continued its action against Linda Naef. After a trial on the merits, the trial court determined that Linda Naef was not a part of the original transaction between Teton Power Products and Transamerica. Her signatures on the promissory note and guaranty were not supported by separate consideration and could not therefore be enforced against her. The trial court gave judgment for Linda Naef and dismissed Transamerica's complaint against her. Transamerica took timely appeal.

Our standard of review of a trial court's decision is well known:

> The trial court's findings of fact are presumed to be correct, and an appellate court shall not disturb them unless they are inconsistent with the evidence, clearly erroneous, or contrary to the great weight of the evidence. On questions of law, an appellate court accords no special deference to, nor is it bound by the trial court's decision. However, if the trial court's judgment is sustainable on any legal ground or theory appearing in the record, an appellate court must affirm that judgment, even if the legal ground or theory articulated by the trial court as sustaining the judgment is incorrect.

*City of Laramie v. Hysong*, 808 P.2d 199, 202 (Wyo.1991).

■ The trial court based its holding on *Moorcroft State Bank v. Morel*, 701 P.2d 1159 (Wyo.1985). In *Moorcroft*, two employees borrowed money from a bank. Eight days later, the bank president persuaded Morel, their employer, to guarantee their obligation. The original loan to the employees was not made subject to receiv-

ing Morel's guarantee. Furthermore, Morel had no other obligation to sign the guarantee. In affirming judgment for Morel in the bank's suit against him on the guaranty, we said the following:

> In this circumstance, it is necessary that there be a separate consideration flowing from the bank to Morel to support and create a valid contract of guaranty between the parties. * * * Simply stated, at the time the bank sought Morel's guaranty, it conferred no benefit upon Morel nor did it suffer any detriment.
>
> The law of guaranty is part of general contract law. When the guarantor is not a part of the original transaction of the principal obligor, his promise must be supported by separate consideration. 38 Am.Jur.2d Guaranty § 45. A naked promise is not sufficient. Consideration is one of the basic elements of a contract. The burden of proving consideration is on the one seeking to recover on the contract. *Miller v. Miller*, Wyo., 664 P.2d 39 (1983).

*Moorcroft*, 701 P.2d at 1161.

Although the trial court found that no consideration passed to Linda Naef for her signature on the guaranty or on the promissory note, Transamerica argues that the rule in *Moorcroft* does not apply to this case. Transamerica contends that the guaranty Linda Naef signed was part of the "original transaction" which created the debt. It also argues that Linda Naef was an accommodation party, and therefore independent consideration to her for her signature was not required. We shall address each of these arguments separately.

The rule in *Moorcroft* only applies where the guarantor was not a part of the original transaction of the obligor. Otherwise, the original transaction itself supplies the necessary consideration. *See, e.g.,* Herschel Arant, *Arant on Suretyship* 71 (1931). Transamerica argues that the original transaction took place on October 20, 1989, when Richard Naef signed the dealership papers and he and Linda Naef signed the loan guarantee. Our review of the record convinces us otherwise. Black's Law Dictionary 1496 (6th ed. 1990) defines "transaction" as follows:

> Act of transacting or conducting any business; between two or more persons; negotiation; that which is done; an affair. An act, agreement, or several acts or agreements between or among parties whereby a cause of action or alteration of legal rights occur. *Miles v. Starks*, Tex.Civ.App., 590 S.W.2d 223, 227. It may involve selling, leasing, borrowing, mortgaging or lending. Something which has taken place, whereby a cause of action has arisen. It must therefore consist of an act or agreement, or several acts or agreements having some connection with each other, in which more than one person is concerned, and by which the legal relations of such persons between themselves are altered. It is a broader term than "contract."

The transaction in question here was the extension of credit to acquire snowmobiles. By Richard Naef's testimony, this transaction came into being sometime in the summer of 1989. In June of that year, Mr. Naef reaffirmed the order placed earlier by Weeks Motor Sports. The first shipment of snowmobiles occurred in August or early September 1989. Regardless of whether these snowmobiles were delivered in the name of Weeks Motor Sports or Teton Power Products, the transaction which resulted in the guaranty and note began with the credit Transamerica extended beginning in the summer of 1989. This transaction predated Mrs. Naef's signature on the guaranty and note by several months. She received no additional consideration for her signature. Therefore, under the authority of the *Moorcroft* case, she cannot be held liable as a guarantor on either the note or the guaranty.

■ Transamerica argues, alternatively, that Mrs. Naef is liable as an accommodation party. The relevant statute concerning accommodation parties in effect at the time the note and guaranty were signed was W.S. 34–21–352 (Dec. 1977 Repl.). This statute defined an accommodation party as follows:

(a) An accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it.

The significance for this case of accommodation party status becomes evident when one examines the more recent Wyoming statute 34.1–3–419 (June 1991 Repl.) which states:

(b) * * * The obligation of an accommodation party may be enforced notwithstanding any statute of frauds *and whether or not the accommodation party receives consideration for the accommodation.* [emphasis added]

Thus, if W.S. 34.1–3–419 applies, Linda Naef would be liable even in the absence of consideration for her signature.

We must first answer the question whether this new language in W.S. 34.1–3–419 should receive retroactive application to the note and guaranty, which were prepared prior to the amendment of the statute. We are guided by the Official Comment to the new statute, which states:

Subsection (b) of Section 3–419 takes the view stated in Comment 3 to *former* Section 3–415 that there need be no consideration running to the accommodation party: "The obligation of the accommodation party is supported by any consideration for which the instrument is taken before it is due. Subsection (2) is intended to change occasional decisions holding that there is no sufficient consideration where an accommodation party signs a note after it is in the hands of a holder who has given value." [emphasis added]

Although the former official commentary referred to in this excerpt was not codified in our previous statute, it does give guidance to what the drafters of the earlier law intended. Evidently, the requirement that no separate consideration need be given for the signature of an accommodation party is a long-standing principle that was not incorporated into the text of our statutes until the most recent revision. This being the case, we will interpret W.S. 34–21–352 to include the new provision that no separate consideration is required. If Mrs. Naef was an accommodation party, she was liable on the guaranty and note regardless of whether she received consideration for signing them.

However, as Mrs. Naef points out, Article 3 of the Uniform Commercial Code, which includes the provisions governing accommodation parties, deals only with negotiable instruments. Wyoming Statute 34–21–304 (Dec. 1977 Repl.) defines a negotiable instrument as follows:

(a) Any writing to be a negotiable instrument within this article must:

(i) Be signed by the maker or drawer; and

(ii) Contain an unconditional promise or order to pay a sum certain in money * * *; and

(iii) Be payable on demand or at a definite time; and

(iv) Be payable to order or to bearer.

We consider first the guaranty Linda Naef signed. It is readily evident that the guaranty was not a negotiable instrument; and she could not, therefore, be an accommodation party on it under the Uniform Commercial Code. The guaranty did not contain any promise or order to "pay a sum certain in money," nor was it payable "to order or to bearer." We cannot, therefore, accept Transamerica's argument that Mrs. Naef's signature on the guaranty made her an accommodation party under the Uniform Commercial Code.

■ Even if Mrs. Naef was not an accommodation party on the guaranty, Transamerica argues that she was an accommodation party, or even a co-maker, on the promissory note. Transamerica highlights our holding in *Lawrence v. Farm Credit System Capital Corp.*, 761 P.2d 640, 651 (Wyo.1988), that one of several signatories to a promissory note will be held liable as a co-maker even if he did not personally receive consideration for his signature. However, we believe that under the circumstances of this case, Mrs. Naef was neither a co-maker nor an accommodation party on the promissory note.

Transamerica's branch manager, Robert Wood, testified as follows during the trial:

Q. Is there any [Transamerica] practice with respect to having wives sign with a husband if the husband is the shareholder?

A. It's a common practice. Probably more often than not.

Q. And why is that?

A. A lot of it deals with the community property laws, transferring of assets, et cetera.

\* \* \* \* \* \*

Q. [Would you have given the corporation a loan] based on Mr. Naef's financial statement alone?

A. It's possible. But I don't believe that it would have been approved, no.

Later, on cross-examination, Mr. Wood testified:

Q. Now, Transamerica never asked for a financial statement from Linda Naef, did it?

A. We received a personal financial statement from Richard Naef.

Q. Okay. But you never asked for or required a financial statement from Linda Naef, did you?

A. It's not the common practice. Married individuals are usually consolidated.

Q. You didn't know whether Mr. Naef was married based on his financial statement, did you?

A. No.

Linda Naef testified as follows concerning the signing of the promissory note:

Q. \* \* \* Did you have some discussion or participate in some discussion with Mr. Wood prior to your signing that?

A. Yes, I did. In fact, I was sitting at my chair and he came up and wanted my signature, and I told him I had no intention of signing that thing because there was no way I could guarantee it. And he said, you don't have to. And I says, it says right on there that I have to guarantee it with a signature. And he said, that's not important. You have two weeks to take care of it.

The evidence shows that Mrs. Naef was pressured into signing the promissory note without any indication that her credit was needed to approve the loan. Although she was an officer of Teton Power Products at the time she signed, the trial court found that "[a]t the time of the signing of the documents and at all times subsequent thereto, Linda Naef owned no interest in the Defendant corporation." Not only was her signature gratuitous, it was most probably illegally obtained as a form of discrimination based on marital status. Federal Consumer Credit Protection Act, 15 U.S.C. § 1691 *et seq.* (1982).

Section 1691(a) of the Federal Consumer Credit Protection Act states that

[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—

(1) on the basis of race, color, religion, national origin, sex *or marital status* or age (provided the applicant has the capacity to contract)[.] [emphasis added]

The implementing regulations, found at 12 C.F.R. § 202.7(d)(1), state:

Except as provided in this paragraph, a creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested.

(12 C.F.R. § 202.7(d) provides certain exceptions from this rule, none of which are applicable here.)

In *Douglas County Nat. Bank v. Pfeiff,* 809 P.2d 1100 (Colo.App.1991), the Colorado Court of Appeals held that a wife who was sued on a note she was required to co-sign to guarantee the debts of her husband's business could state a counterclaim for discrimination based on marital status under the Equal Credit Guaranty Act. The facts of *Pfeiff* are quite similar to those of this case, and we are persuaded by its reasoning that Transamerica violated the Act in this instance.

The evidence, then, shows that Mrs. Naef had no interest in the business for which she was signing, did not wish to sign, and only signed after a Transamerica representative told her that her signature was "not important." She had no intent to be a co-

maker and was told in essence that she would not be. We recognize that these elements, although they suggest misrepresentation or overreaching, would not alone be sufficient to render the promissory note unenforceable against Mrs. Naef. *Cf. Standard Finance Co., Ltd. v. Ellis,* 3 Haw.App. 614, 657 P.2d 1056 (1983) (fact that husband assured wife that her signature was a formality and he alone would be liable on note did not make note unenforceable against co-signer wife); *Abruzzino v. Farmers' & Merchants' Bank,* 168 Ga. App. 639, 309 S.E.2d 911 (1983) (wife was liable on promissory note she signed for husband's business even though she was not actively involved in the business and did not know exactly what she was signing). Were these the only facts presented to us, we would probably have to hold that Mrs. Naef was liable as an accommodation party. However, when coupled with evidence that Transamerica acted under a blanket, illegal and unreasonable policy of requiring spousal signatures, the totality of the circumstances convince us that Mrs. Naef's signature on the promissory note cannot be enforced against her as either a co-maker or an accommodation party. Under these circumstances of misrepresentation and illegality, we will affirm the decision of the trial court for Mrs. Naef.

We hold that the trial court properly dismissed Transamerica's suit against Mrs. Naef.