C.K. LAWRENCE, also known as Charles K. Lawrence; Dorothy D. Lawrence; James W. Lawrence and Pat E. Lawrence, husband and wife; Dan B. Lawrence, Appellants (Defendants),

Clear Creek Ranch Co., Inc.; Charles K. Lawrence Order Buying Company, Inc.; Lawrence Land Company, Inc.; Linda Ann Love, formerly Linda Ann Lawrence, also known as Linda Lawrence Love; John D. Lawrence; Charles F. Lawrence, (Defendants),

v.

FARM CREDIT SYSTEM CAPITAL CORPORATION and Production Credit Association of the Midlands, formerly Wyoming Production Credit Association, Appellees (Plaintiffs).

FARM CREDIT SYSTEM CAPITAL CORPORATION and Production Credit Association of the Midlands, formerly Wyoming Production Credit Association, Appellants (Plaintiffs),

v.

CLEAR CREEK RANCH CO., INC.; Charles K. Lawrence Order Buying Company, Inc.; Lawrence Land Company, Inc.; James W. Lawrence; Dan B. Lawrence; Linda Ann Love, formerly Linda Ann Lawrence, also known as Linda Lawrence Love, Appellees (Defendants),

C.K. Lawrence, also known as Charles K. Lawrence; Dorothy D. Lawrence; Pat E. Lawrence, (Defendants).

Nos. 87–167, 87–168.

Supreme Court of Wyoming.

Aug. 24, 1988.*

Appellants Petition for Rehearing Denied Sept. 20, 1988.

Appellee's Motion to Dismiss Denied Sept. 20, 1988.

* Case assigned 1–15–88; opinion circulated for    comment 4–12–88.

Henry A. Burgess and Darlene L. Reiter of Burgess & Davis, Sheridan, for appellants in Case No. 87-167 and for appellees in Case No. 87-168.

Mark J. Murphy of Shoumaker and Murphy, Sheridan; and Howard P. Olsen, Jr. of Simmons, Raymond, Olsen, Ediger, Selzer & Ballew, P.C., Scottsbluff, Neb., for appellants in Case No. 87-168 and for appellees in Case No. 87-167.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

MACY, Justice.

These consolidated cases involve appeals from the judgment entered on a directed verdict in favor of Production Credit Association of the Midlands (Production Credit) and Farm Credit System Capital Corporation (Farm Credit) and against James W. Lawrence, Pat E. Lawrence, Charles K. Lawrence, and Dorothy D. Lawrence on two separate promissory notes and allowing foreclosure and sale of personal and real property used as security for those promissory notes, including after-acquired property. In addition, the judgment found that Charles K. Lawrence Order Buying Company, Inc. (Order Buying Company), Lawrence Land Company, Inc. (Land Company), James W. Lawrence, and Linda Lawrence Love were not liable as makers, guarantors, or co-signers on one promissory note and that Clear Creek Ranch Co., Inc. (Clear Creek) was not liable as a maker, guarantor, or co-signer on either promissory note. The judgment also dismissed the counterclaims of Dan B. Lawrence, Charles F. Lawrence, John D. Lawrence, Linda Lawrence Love, James W. Lawrence, and Pat E. Lawrence.

We affirm in part, reverse in part, and remand.

The parties' issues on appeal are summarized as follows:

1. Whether the trial court erred when it entered its judgment on the directed verdict:

a. awarding Production Credit and Farm Credit judgment against James W. Lawrence, Pat E. Lawrence, Charles K. Lawrence, and Dorothy D. Lawrence on the two separate promissory notes and allowing foreclosure on personal and real property used as security for the payment of the promissory notes;

b. awarding Production Credit and Farm Credit all but $100 from the pro-

ceeds of the sale of the wool and sheep branded X7 and the accompanying incentive payments;

    c. determining that Order Buying Company, Land Company, Clear Creek, James W. Lawrence, and Linda Lawrence Love were not liable as makers, guarantors, or co-signers on the January 19, 1984, promissory note; and

    d. dismissing the counterclaims of Dan B. Lawrence, James W. Lawrence, and Pat E. Lawrence.

    2. Whether the trial court erred in refusing to hear evidence relating to the financial collapse of the Wyoming Production Credit Association and Production Credit.

This action commenced with the filing of an original complaint on October 3, 1985, which was amended on two occasions.[1] Production Credit and Farm Credit alleged in the last amended complaint filed on September 18, 1986, that Order Buying Company, Land Company, Charles K. Lawrence, Dorothy D. Lawrence, Linda Lawrence Love, and James W. Lawrence, in consideration of an extension or renewal loan, executed and delivered to Wyoming Production Credit Association, now Production Credit, a promissory note in the principal amount of $950,000, plus interest, payable on or before December 15, 1984. The complaint also alleged that, to secure payment of a $955,000 promissory note and as part of that same transaction, Land Company executed a mortgage on approximately 6,841 acres of agricultural land.[2] It was further alleged that Charles K. Lawrence, Dorothy D. Lawrence, James W. Lawrence, and Linda Lawrence Love, doing business as Clear Creek, executed a security agreement pledging livestock, livestock proceeds or product, feed crops, equipment, and all after-acquired property as security for the

payment of the $950,000 promissory note. The complaint then alleged that the conditions of the promissory note, mortgage, and security agreement were broken and that Charles K. Lawrence had converted secured properties. It also stated that there was a lien on the cash proceeds from the sale of sheep branded X7 and other after-acquired livestock or equipment and that Dan B. Lawrence claimed these proceeds. The complaint requested that the trial court find due and owing the amount of $686,918.25, which included interest through July 14, 1986, plus interest accruing thereafter at the rate of $215.1780 per day, and that the lien on the real and personal property in favor of Production Credit and Farm Credit be foreclosed with the property being sold to reduce the judgment. The complaint further asked that the proceeds from the sale be awarded to Production Credit and Farm Credit.

The complaint also alleged that James W. Lawrence and Pat E. Lawrence, in consideration for an extension or renewal loan, executed and delivered a promissory note for $49,000 payable on or before December 15, 1984, and executed a security agreement pledging to Wyoming Production Credit Association, now Production Credit, existing and future livestock as security for the loan. The complaint alleged that such promissory note was not paid when due and prayed for a judgment of $34,-350.22 plus interest of $8.5240 per day from and after July 14, 1986, plus attorney's fees and costs. It also prayed for an order giving them authority to sell the security to reduce the judgment and giving them ownership of the proceeds from the sale of the sheep branded X7.

In response to Production Credit's and Farm Credit's last amended complaint, Clear Creek, Order Buying Company, Land

---

**1.** Wyoming Production Credit Association was the original plaintiff in this action. The record indicates that, after commencement of this action, Wyoming Production Credit Association transferred all its assets to Production Credit. The first amended complaint, therefore, designated as plaintiff Production Credit, formerly Wyoming Production Credit Association.

    Thereafter, Farm Credit purchased a participating interest in the loans and security in-

volved in this case except for the $49,000 promissory note and security agreement executed by James W. Lawrence and Pat E. Lawrence. Thus, Farm Credit was added as a party plaintiff in the second amended complaint.

**2.** This mortgage was later used as security for the $950,000 promissory note.

Company, Charles K. Lawrence, Dorothy D. Lawrence, James W. Lawrence, Pat E. Lawrence, Linda Lawrence Love, John D. Lawrence, Charles F. Lawrence, and Dan B. Lawrence (defendants) filed an answer and counterclaim on October 3, 1986. In their answer, the defendants alleged that Dan B. Lawrence was the owner of the sheep branded X7 and that he was legally entitled to those proceeds. Their counterclaim alleged that Dan B. Lawrence, James W. Lawrence, Pat E. Lawrence, Robert S. Love, and Linda Lawrence Love had applied for loans from the Farmers Home Administration and the Small Business Administration but that Production Credit arbitrarily, capriciously, and maliciously refused to sign nondisturbance agreements with the intent to damage, humiliate, and embarrass them; that Production Credit and Farm Credit damaged defendants by objecting to their securing a loan with the State of Wyoming Farm Loan Board; and that Production Credit and Farm Credit had brought their action in bad faith. It also alleged that Production Credit and Farm Credit had intentionally harassed, embarrassed, and denied James W. Lawrence, Dan B. Lawrence, and Linda Lawrence Love an opportunity to avail themselves of federal assistance in a young and beginning ranchers program; and that each of the individual persons signing the promissory notes had done so as a guarantor and not as a maker. Finally, it alleged that Production Credit had breached an agreement to advance to defendants $100,-000 from the State of Wyoming Farm Loan Board loan proceeds; and that Production Credit had breached its agreement with each defendant to extend between $955,000 and $2,000,000 as a revolving line of credit until December 15, 1990, by bringing the lawsuit.

When faced with a directed verdict question, this Court's applicable standards of review are as follows:

In reviewing the grant of a directed verdict by a trial court, consideration must be given to all evidence favorable to [the] party against whom the motion is directed, as well as to all reasonable and legitimate inferences which might be drawn therefrom. Whether or not the evidence so viewed is sufficient to create an issue for the jury is solely a question of law to be answered by the trial court. That court must determine whether or not the evidence is such that, without weighing the credibility of the witnesses[ ] or otherwise[ ] considering the weight of the evidence, there is but one conclusion as to [the] verdict which men of reason could reach.

*Town of Jackson v. Shaw*, 569 P.2d 1246, 1250 (Wyo.1977) (citations and footnote omitted).

"In determining whether a verdict should have been directed, the appellate court applies the same standard as does the trial court in passing on the motion originally. * * * Whether a verdict should be directed is a question of law and on those questions litigants are entitled to full review by the appellate court without special deference to the views of the trial court." 9 Wright and Miller, Federal Practice and Procedure, Civil, § 2536, p. 595, and § 2524, pp. 541–542.

*Carey v. Jackson*, 603 P.2d 868, 877 (Wyo.1979).

[S]ince a directed verdict deprives the parties of a determination of the facts by a jury, such motion should be cautiously and sparingly granted.

*Cody v. Atkins*, 658 P.2d 59, 61 (Wyo.1983). See also *Sims v. General Motors Corporation*, 751 P.2d 357 (Wyo.1988).

■ Applying these rules, we will decide whether the trial court erred when it directed a verdict awarding Production Credit and Farm Credit judgment against James W. Lawrence, Pat E. Lawrence, Charles K. Lawrence, and Dorothy D. Lawrence on the two separate promissory notes and allowing foreclosure on the personal and real property used as security for the payment of those promissory notes. We begin by looking at the documents themselves to determine if they are ambiguous. As stated in *Farr v. Link*, 746 P.2d 431, 433 (Wyo.1987):

Our rules of contract construction are well established. The construction or in-

terpretation of a contract is a question of law for the court. The basic purpose in construing or interpreting a contract is to determine the intent of the parties. If the contract is in writing and the language is clear and not ambiguous, the intention of the parties is to be secured from the words of the agreement.

* * * An ambiguous contract is an agreement which is obscure in its meaning because of indefiniteness of expression or because of a double meaning being present. Whether ambiguity exists in a contract is a question of law.

(Citations omitted.) We have also stated that, if a contract is unambiguous, this Court will not rewrite that contract under the guise of interpretation. *Arnold v. Mountain West Farm Bureau Mutual Insurance Company, Inc.*, 707 P.2d 161 (Wyo.1985).

Examination of the record indicates the promissory note of January 19, 1984, in the amount of $950,000 signed by Charles K. Lawrence, Dorothy D. Lawrence, James W. Lawrence, Linda Lawrence Love, Order Buying Company, Land Company, and Clear Creek is clear and unambiguous. That promissory note provides in applicable part:

On or before December 15, 1984 for value received, I, we or either of us promise to pay to the order of Wyoming PRODUCTION CREDIT ASSOCIATION, at its office in the city of Casper, State of Wyoming, Nine Hundred Fifty Thousand and NO/100 Dollars, $950,000.00 * * *.

The promissory note of January 23, 1984, in the amount of $49,000 signed by James W. Lawrence and Pat E. Lawrence uses the same applicable language. That promissory note provides in part:

On or before February 15, 1985 for value received, I, we or either of us promise to pay to the order of Wyoming PRODUCTION CREDIT ASSOCIATION, at its office in the city of Casper, State of Wyoming, Forty-Nine Thousand and NO/100 Dollars, $49,000.00 * * *.

Likewise, the security agreement pledging livestock, equipment, and after-acquired property signed by Charles K. Lawrence, Dorothy D. Lawrence, James W. Lawrence, and Linda Lawrence Love as security for the payment of the January 19, 1984, promissory note and the security agreement pledging livestock and after-acquired livestock signed by James W. Lawrence and Pat E. Lawrence as security for the payment of the January 23, 1984, promissory note are clear and unequivocal.

The sole discrepancy arises over the meaning of certain language encompassed in the mortgage which was executed by Land Company on a $955,000 promissory note and which was later used as security for the January 19, 1984, promissory note in the amount of $950,000. That language specifically states:

PROVIDED, ALWAYS, and these presents are upon this express condition, that if the said Mortgagor shall and does well and truly pay or cause to be paid to the said Mortgagee, its successors and assigns, the sum of $955,000.00 according to the conditions of one promissory note dated January 12, 1983 executed by Charles K. Lawrence, Dorothy D. Lawrence, James W. Lawrence, Linda Lawrence Love, dba Clear Creek Ranch, Charles K. Lawrence[,] Order Buying Co., Inc., Lawrence Land Company, executed by the Mortgagor and payable to the order of the Mortgagee, and of any and all renewals or extensions thereof, together with interest thereon, at such rate or rates as may be specified therein, and such further amount not exceeding $1,045,000.00 *which may be advanced* in the future by the Mortgagee to the Mortgagor, *but if advanced,* to be advanced prior to December 15, 1990, making the aggregate and ultimate amount secured hereby the sum of $2,000,000.00, and the whole amount to become due and payable on or before December 15, 1990, with interest as aforesaid according to the promissory note or notes to be executed by the Mortgagor payable to the order of the Mortgagee, which sum or sums of money the said Mortgagor hereby covenants to pay * * *.

(Emphasis added.) Those of the Lawrence family who brought this appeal contend

that this language constituted an obligation on the part of Production Credit and Farm Credit to advance credit and that, in bringing this suit, they breached that agreement. Conversely, Production Credit and Farm Credit assert that the document, through use of the word "may," provided that they could advance additional moneys if they desired and that they were not under any mandatory obligation to do so.

In *Bethurem v. Hammett,* 736 P.2d 1128, 1136 (Wyo.1987), we stated:

> As a general rule, courts will ascertain the intentions of the parties by interpreting the language that is used in the contract and will not resort to adding what has been omitted or omitting what has been added. If the contract is in writing and the language is clear and unambiguous, the intention is to be established from the words of the contract by considering the contract as a whole and reading each provision in light of all other provisions.

(Citations omitted.) We have further stated that, if a contract is free from ambiguity, we need only to look at the plain meaning of the words in our effort to ferret out the intention of the parties. *E & E Mining, Inc. v. Flying "D" Group, Inc.,* 718 P.2d 58 (Wyo.1986).

According to 26A Words and Phrases, May, 386 (1953), and the numerous cases cited therein, the word "may" is generally used to imply permissive or discretional, rather than mandatory, obligation. See also *Filtrol Corp. v. Loose,* 209 F.2d 10 (10th Cir.1953); *Aroostook Valley Railroad Company v. Bangor & Aroostook Railroad Company,* 455 A.2d 431 (Me. 1983); and *Leghorn v. Wieland,* 289 So.2d 745 (Fla.App.1974). We see no reason why that approach should not be followed by this Court in this instance. While we also recognize that some courts adhere to the rule of law that the meaning of the word "may" must be determined from the whole contract and the manifest intention of the parties as expressed therein, *Burgess Mining & Construction Corp. v. City of Bessemer,* 294 Ala. 74, 312 So.2d 24 (1975); *Carleno Coal Sales v. Ramsay Coal Co.,* 129 Colo. 393, 270 P.2d 755 (1954), an appli-

cation of that rule with regard to this case dictates the same conclusion. We hold that Production Credit and Farm Credit were not under a mandatory obligation to lend any amount of money to the Lawrences other than as encompassed within the promissory notes and that the mortgage executed as security for the payment of the January 19, 1984, promissory note is clear and unambiguous on its face.

■ The Lawrences assert that testimony presented at trial shows the agreements were meant to be "line of credit loans" rather than simple promissory notes which were due and owing on December 15, 1984, and February 15, 1985, respectively. We will not deviate in this case from our rule of law that, unless there is an ambiguity or lack of clarity in the terms of a contract, this Court will not look beyond the contract to ascertain its meaning. *Bethurem,* 736 P.2d 1128; *Samuel Mares Post No. 8, American Legion, Department of Wyoming v. Board of County Commissioners of County of Converse,* 697 P.2d 1040 (Wyo.1985). If the intent of the parties can be ascertained from the plain and unambiguous language of the contract, such should be done as a matter of law without reference to extrinsic evidence. *Id.* Accordingly, we hold that the trial court properly directed a verdict awarding Production Credit and Farm Credit judgment against James W. Lawrence, Pat E. Lawrence, Charles K. Lawrence, and Dorothy D. Lawrence on the two separate promissory notes and allowing foreclosure on the personal and real property used as security for the payment of those promissory notes.

■ We will now decide whether the trial court erred when it found that the proceeds from the sale of the wool and sheep branded X7 and the accompanying incentive payments less $100 belonged to Production Credit and Farm Credit pursuant to the security agreement executed by Charles K. Lawrence, Dorothy D. Lawrence, James W. Lawrence, and Linda Lawrence Love as security for the January 19,

1984, promissory note for $950,000.[3] Resolution of this issue requires a two-step inquiry. First, we must determine if the after-acquired property clause in the security agreement executed in connection with the January 19 promissory note was sufficiently descriptive to support the trial court's finding that Production Credit and Farm Credit had a security interest which would reach these aforementioned properties. If we answer that question in the affirmative, we then must further determine whether the trial court properly directed a verdict in favor of Production Credit and Farm Credit upon its finding that Charles K. Lawrence was the actual purchaser and owner of these sheep, thus bringing these sheep and the proceeds therefrom within the coverage of the security agreement.

■ We stated previously that the security agreements are clear and unequivocal. Therefore, we will look solely to the words of the agreement to determine the intention of the parties, considering the contract as a whole and reading each provision in light of all other provisions. Inserted in typewritten form on the front page of the security agreement covering the January 19, 1984, promissory note are the following descriptions of the collateral:

This security agreement is intended to cover 445.5 head of cattle, branded on the left ribs, or     on the left hip, or     on the left ribs and shoulder or left ribs or left shoulder, or     on the left hip and shoulder, or     on the left hip and shoulder, or     on the left ribs or     on the left ribs and more particularly described as: 295 cows[,] 125.5 calves[,] 25 bulls[.]

Together with 2,469 head of sheep branded     on the right hip or on the right shoulder or back, or on the left shoulder, or     on the left shoulder and more particularly described as: 2,389 ewes[,] 80 bucks[.]

Together with all natural increase and additions to the above-described livestock, including any livestock to be purchased.

Together with the 1984 wool clip, before and after shearing.

Together with all hay, grain and feed on hand now growing or to be acquired.

Together with all machinery and equipment now owned by said debtors, and consisting of, but not limited to the following, and including any machinery and equipment to be acquired[.]

Together with all production of the above described collateral including all proceeds from the sale, transfer or disposition thereof.

The relevant provision regarding after-acquired collateral is found in the third paragraph which provides that the agreement includes "all natural increase and additions to the above-described livestock, including any livestock to be purchased." Additionally, the second page of the security agreement contains this standardized after-acquired property clause:

The Secured Party and Debtor agree: that, to the maximum extent permitted by law, *any and all collateral of like type or kind as that described herein* as part of the collateral, *now owned or hereafter acquired* by the Debtor shall secure all obligations covered by this Security Agreement, and Secured Party shall have a security interest in all such collateral by reason of this agreement, for the purposes herein described; that the buyer in the ordinary course of business (other than a person buying farm products from a person engaged in farming operations) may purchase the collateral herein described free of this security interest. Except for this latter provision of the Uniform Commercial Code, the Debtor is not otherwise authorized to sell, exchange, or otherwise dispose of the collateral. The parties hereto fur-

---

**3.** The trial court determined that the proceeds from the sale of the wool and the sheep branded X7 were to be applied to the debt of Charles K. Lawrence and Dorothy D. Lawrence. Although James W. Lawrence had an ownership interest in the X7 brand, there was no evidence elicited at trial indicating that either James W. Lawrence or Pat E. Lawrence was involved in the purchase or ownership of these sheep; thus, the security agreement executed by James W. Lawrence and Pat E. Lawrence on their smaller promissory note could not reach these sheep.

ther agree: that this Security Agreement includes *all live stock now owned or hereafter acquired by Debtor, whether by purchase, natural increase, or otherwise during the continuance of this Agreement * * *.*

(Emphasis added.)

W.S. 34–21–923 (U.C.C. § 9–204) establishes the validity of after-acquired property clauses in security agreements. That section provides in pertinent part:

(a) Except as provided in subsection (b) of this section, a security agreement may provide that any or all obligations covered by the security agreement are to be secured by after-acquired collateral.

(b) No security interest attaches under an after-acquired property clause to consumer goods other than accessions (W.S. 34–21–943 (9–314)) when given as additional security unless the debtor acquires rights in them within ten (10) days after the secured party gives value.

The sufficiency of a collateral description is governed by W.S. 34–21–910 (U.C.C. § 9–110), which states:

For the purposes of this article any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described.

Of necessity, the description of property in an after-acquired property clause will be by type, as a more specific description generally is not possible. See 8 R. Anderson, Uniform Commercial Code § 9–110:20 (1985). In J. White and R. Summers, U.C.C.2d HB § 23–16 at 963 (1980), the authors state:

[N]early all courts permit broad descriptions with respect to shifting and after-acquired collateral, and we applaud this permissiveness. The floating lien with its after-acquired property clause requires broad descriptions.

The Fifth Circuit Court of Appeals, in a case involving after-acquired livestock, said:

We hold that the description of the farmers' swine in the FmHA security agreement, to wit, "all livestock ... now owned or hereafter acquired by Debtor, together with all increases, replacements, substitutions, and additions thereto," reasonably identified the hogs either owned by the farmers at the time the loans were made or acquired thereafter, either by purchase, trade, procreation, or otherwise.

*United States v. Southeast Mississippi Livestock Farmers Association,* 619 F.2d 435, 438 (5th Cir.1980). Similarly, in 8 R. Anderson, Uniform Commercial Code, supra at 613, the author states that "[a]fter-acquired property is sufficiently described by the phrase 'all livestock hereafter acquired.'"

In *Landen v. Production Credit Association of Midlands,* 737 P.2d 1325 (Wyo. 1987), we said that specific typewritten descriptions of collateral inserted by the parties in a security agreement control over a general description in the standard printed form. In this case we do not perceive any inconsistency between the two after-acquired property provisions. Even if we look solely at the typewritten provisions inserted by the parties, however, it is clear that the after-acquired collateral clause is sufficient to reach the sheep branded <u>X7</u>. These inserted provisions initially describe, by number and brand, the existing sheep and cattle that are covered by the agreement. The after-acquired property provision, in a separate paragraph, then provides that any additions to the previously described livestock are to be covered by the agreement, including "any livestock to be purchased." The after-acquired clause is less specific because, in the nature of the business, it must be. The fact that a different brand was placed on the later purchased sheep does not affect the result if the sheep were in fact owned by the debtor. Were we to hold otherwise, any debtor/rancher subject to a similar security agreement could avoid the creditor's security interest in his livestock simply by changing the brand on all livestock replacements or additions. We hold that the sheep branded <u>X7</u> were reasonably identified by

the security agreement in this case.[4] If the sheep were indeed purchased or owned by Charles K. Lawrence, the proceeds from the sale of such sheep were subject to the security interest of Production Credit and Farm Credit.

■ The testimony and other evidence regarding who actually purchased and owned the sheep branded X7 is complicated and somewhat conflicting. We note initially, however, that the record discloses that Dan B. Lawrence and James W. Lawrence, who are both sons of Charles K. Lawrence, were co-owners of the X7 brand. Pursuant to W.S. 11–20–108, a brand is evidence of ownership of livestock in legal proceedings involving title to the livestock.

The record reveals that in April 1984 a severe spring blizzard caused major livestock losses at the Clear Creek Ranch. As a result, Charles K. Lawrence and Dorothy D. Lawrence applied for and received a ranch disaster loan in the amount of $253,000 from the Small Business Administration. A separate family ranch (the Inchauspe Ranch) was pledged as collateral on this loan. The specific purposes for the loan were stated in the loan agreement as being:

A. Approximately $116,600 to replace sheep.

B. Approximately $132,900 to replace cattle.

C. Approximately $3,500 to repair fencing.

Disbursement of the loan funds was made by sending Charles K. Lawrence and Dorothy D. Lawrence two checks totaling $120,000 on December 31, 1984, and one check for $133,000 on March 12, 1985.

The testimony regarding the application of these loan funds is conflicting. Charles K. Lawrence testified that, with the loan funds, he purchased sheep and cattle "indirectly" through the Order Buying Company, including the sheep branded X7. Charles K. Lawrence further testified that the X7 brand was used exclusively on the sheep purchased with the Small Business Administration loan funds.[5] Charles K. Lawrence additionally stated that, although he purchased the sheep through his Order Buying Company and although they were purchased with funds he received from the Small Business Administration loan, he never owned these sheep.

Conversely, Dan B. Lawrence testified that he purchased the sheep branded X7 with funds he borrowed from the First Interstate Bank of Buffalo (First Interstate). In a sense, and as a result of a series of transactions, the testimony of both Charles K. Lawrence and Dan B. Lawrence is supported by the record. The record reveals that Dan B. Lawrence initially attempted to obtain a loan from First Interstate for the purchase of sheep by giving the bank a purchase money security interest in the sheep. First Interstate, however, would not approve the loan without additional collateral. Consequently, Charles K. Lawrence and Dan B. Lawrence jointly applied for the loan, and Charles K. Lawrence pledged, as additional collateral, a certificate of deposit in the amount of $100,000. This certificate of deposit was obtained with funds received from the Small Business Administration loan. First Interstate then approved two loans to Charles K. Lawrence and Dan B. Lawrence, one for $133,000 and the other for $100,000. Charles K. Lawrence and Dan B. Lawrence both signed the promissory notes evidencing the loans. The $133,000

4. The Lawrences cite Landen, referenced earlier in the body of this opinion, in support of their argument that the descriptions in the after-acquired collateral clauses are insufficient to reach the sheep branded X7. The holding in Landen is distinguishable from the instant case. In that case, the security agreement specifically described certain cattle, and the after-acquired property provision was identical to the one in the instant case. We held, in Landen, that the security agreement did not cover horses which were subsequently purchased. Critical to that decision was the fact that the after-acquired livestock was of an entirely different species rather than an increase or addition to the specifically described livestock.

5. Charles K. Lawrence also testified that the cattle purchased with the Small Business Administration loan funds were branded with a brand owned by his daughter, a brand which also was not listed on the Production Credit security agreement.

loan was secured by a purchase money security interest in the sheep branded X7, and the $100,000 loan was secured by the certificate of deposit.

The proceeds from the loans were deposited in an account with First Interstate held either by Charles K. Lawrence, Dan B. Lawrence, and Dorothy D. Lawrence, jointly, or by Dan B. Lawrence, individually. A discrepancy as to this fact appears in the testimony. The sheep branded X7 were purchased with a check written on the Order Buying Company account by Dan B. Lawrence, who was a signatory on that account. Thereafter, Dan B. Lawrence wrote an equivalent check to the Order Buying Company out of the account holding the First Interstate loan proceeds. Upon purchase of the sheep branded X7, Dan B. Lawrence told the brand inspector to enter the name of Charles K. Lawrence as owner on the certificate of ownership prepared by the brand inspector. The bills of sale for the sheep branded X7 designate Charles K. Lawrence as the purchaser.

In directing a verdict for Production Credit and Farm Credit on the issue of whether they were entitled to the proceeds from the sale of the sheep branded X7, the trial court said, in reference to the above-elaborated evidence:

I believe that the testimony is clear in this case and I don't think reasonable men could differ, but that those sheep were bought with disaster funds. Mr. Lawrence even testified that is really what was used. They channeled those funds through First Interstate Bank so the loan went to Dan Lawrence, but I am afraid I am not going to buy it. Any-

way, those X7 over Bar sheep were sheep used to replace other animals lost, and as such, come within the security agreement as after-acquired sheep, and those funds will be set over to the [Production Credit].

We do not agree with the trial court's resolution of this issue. In conformance with our standards of review of a directed verdict as set forth previously, we are not able to say that, on the basis of the evidence in the record and giving consideration to the evidence favorable to appellants without considering the credibility of the witnesses, there is but one conclusion which men of reason could reach as to the ownership of the sheep branded X7. This is a question of fact, and the conflicting evidence of ownership should have been submitted to the jury. Consequently, we reverse this aspect of the trial court's decision and remand for jury consideration the question of whether Charles K. Lawrence purchased or owned the sheep branded X7. Should the jury find that Charles K. Lawrence purchased or owned the sheep branded X7, then, as a matter of law, the sheep branded X7 and proceeds therefrom are after-acquired collateral falling within the coverage of the security agreement.

We now decide whether the trial court erred when it ruled that Order Buying Company, Land Company, Clear Creek, James W. Lawrence, and Linda Lawrence Love were not liable as makers, guarantors, or co-signers on the January 19, 1984, promissory note. That promissory note was signed in the following manner:

It is clear that Order Buying Company, Land Company, Clear Creek, James W. Lawrence, and Linda Lawrence Love each signed the disputed promissory note.

In *Gennings v. First National Bank at Thermopolis*, 654 P.2d 154 (Wyo.1982), a case with similar facts to those in the present case, we recognized that a maker

of a promissory note, absent a valid defense, becomes individually responsible for its repayment and that, when an instrument does not specify otherwise, a person who, along with another, signed a promissory note in the lower right corner on lines for signatures of makers, even though signing as an accommodation party, was liable as a maker. Although Order Buying Company, Land Company, Clear Creek, James W. Lawrence, and Linda Lawrence Love each contend that this case is not applicable because it improperly applies Article 3, Chapter 21, Title 34 of the Wyoming statutes entitled "Commercial Paper," we conclude that the applicability or inapplicability of that section is not dispositive. We hold such argument is groundless and meritless, and we see no reason why the rules as stated in Gennings should not be applied here.

The sole justification for their position that they should not be held liable as makers of the promissory note is that the promissory note lacked adequate consideration. As evidenced by the record, $950,000 were received by Charles K. Lawrence and Dorothy D. Lawrence from the Wyoming Production Credit Association. The fact that they alone actually received those moneys apart from the others who signed the promissory note is immaterial. It is not essential that the consideration move to each of the makers in order to recover on a promise made by several parties. *Gennings*, 654 P.2d 154. See also generally *Houghton v. Thompson*, 57 Wyo. 196, 115 P.2d 654 (1941); and *Barrett v. Mahnken*, 6 Wyo. 541, 48 P. 202 (1897). We hold that the trial court erred when it found those parties were not liable as makers, guarantors, or signers on the January 19, 1984, promissory note, and we reverse that part of the trial court's decision.

█ We will also determine whether the trial court erred when it directed a verdict dismissing the counterclaims of Dan B. Lawrence, James W. Lawrence, and Pat E. Lawrence which alleged that Production

Credit had arbitrarily, capriciously, and maliciously refused to sign nondisturbance agreements with other lenders and otherwise denied them opportunities to avail themselves of additional financing; and that Production Credit and Farm Credit brought this action in bad faith damaging each of their respective credit reputations and financial positions.[6] Review of the record shows that there is absolutely no evidence which suggests that Production Credit improperly manipulated the contract provisions to its benefit and to the Lawrences' detriment. The fact that the Lawrences believed Production Credit would not foreclose on the promissory notes when they became due and the fact that the economics of the ranch or farm industry had gradually caused the Lawrences to possess a weakened financial position are not enough to create an issue of material fact sufficient for determination by a jury with respect to their claims of bad faith in contract or bad faith in tort.

█ The refusal by Production Credit to provide nondisturbance agreements to the Lawrences so that they could get additional financing does not in and of itself show that Production Credit acted in bad faith. Production Credit was not obligated to sign any of the nondisturbance agreements. It simply determined that giving such agreements was not in its best financial interest as a creditor of the Lawrences. The same reasoning refutes the claims of the Lawrences with regard to assertions that Production Credit improperly refused to personally loan them additional moneys. Nothing in the record discloses that Production Credit or Farm Credit unjustly caused the sale of any of the Lawrences' livestock or livestock products. Production Credit and Farm Credit were entitled to foreclose on the respective promissory notes, security agreements, and mortgage. Actions taken after that time by the Lawrences in an attempt to meet any of their debt obligations to Production Credit and Farm Credit were taken freely by the Law-

---

**6.** We do not discuss the propriety of the trial court's directed verdict dismissing the counterclaims of Charles F. Lawrence, John D. Law-

rence, or Linda Lawrence Love because they failed to appeal such issue.

rences in their own best judgment and cannot be said to have been compelled by Production Credit or Farm Credit.

Production Credit and Farm Credit did not improperly join or continue to include Dan B. Lawrence, James W. Lawrence, and Pat E. Lawrence as parties to this suit. Pat E. Lawrence and James W. Lawrence were signatories respectively on one and both of the promissory notes in this case. Additionally, Dan B. Lawrence and James W. Lawrence were co-owners in the X7 brand, and proceeds from the sale of livestock with that brand were directly in dispute here because Dan B. Lawrence claimed he was entitled to such proceeds rather than Production Credit or Farm Credit. As stated in part in W.S. 11–20–108:

[A] brand shall be received as evidence of ownership in all legal proceedings involving title to the animal.

Given that a brand signifies ownership in livestock and, therefore, arguably ownership in the proceeds from such livestock, we hold that Production Credit and Farm Credit had sufficient cause to file suit against them because of their ownership interest in the brand. Dan B. Lawrence's claim that, because he paid off his loan with Production Credit, it relieved him as a party to this suit is groundless. The loan paid by him to Production Credit was a distinct and separate loan having no connection whatsoever with those loans in this case.

An examination of the record further discloses that Pat E. Lawrence failed to appear at trial or by any other means to personally establish the counterclaims she alleged against Production Credit and Farm credit. Insofar as the testimony of her husband, James W. Lawrence, may be said to be in support of her claims, we note that such testimony is unconvincing for the reasons previously enumerated.

Even though we give a party against whom a directed verdict has been granted every favorable consideration and recognize the difficulty in sustaining a directed verdict because of our standards of review, we cannot say that the trial court acted improperly when it directed a verdict dismissing the counterclaims of Dan B. Lawrence, James W. Lawrence, and Pat E. Lawrence. We hold that those parties failed to meet the burden of proof placed upon them to show that an actionable cause existed against Production Credit and Farm Credit.

Finally, we will decide whether or not the trial court erred in refusing to hear evidence relating to the financial problems of the Wyoming Production Credit Association and Production Credit. In the case of *Jahnke v. State*, 682 P.2d 991, 1005 (Wyo. 1984), we summarized our long standing standard of review regarding the admissibility of evidence:

The rule which this court has applied with respect to rulings as to admissibility of evidence is articulated in *Taylor v. State, Wyo.*, 642 P.2d 1294, 1295 (1982), as follows:

"It has been held generally that the admission of evidence is within the sound discretion of the trial court and absent a clear abuse of discretion will not be disturbed. It is also the general rule that the foundation, relevance, competency, materiality, and remoteness are within the sound discretion of the trial court and will be upheld on appeal absent a clear abuse of discretion." (Footnotes omitted.)

The burden of establishing the clear abuse of discretion must be assumed by the party who attacks the ruling of the trial court. That party must establish that the ruling of the trial court was erroneous and that it did affect substantial rights of the party. The trial court in the exercise of its discretion can exclude even relevant evidence when there are countervailing considerations such as "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." Rule 403, W.R.E.

The definition that this court has espoused of an abuse of discretion is found

in *Martinez v. State, Wyo.,* 611 P.2d 831, 838 (1980), where it is stated as follows:

"* * * An abuse of discretion has been said to mean an error of law committed by the court under the circumstances. * * *"

* * * * * *

"In the context of evidentiary rulings at trial, this court has long adhered to the doctrine that a sufficient offer of proof is necessary so that this court may be adequately apprised of the nature of the excluded testimony. The dual purpose of this requirement is to enable the trial court to be fully advised in the exercise of its discretion regarding the admission of evidence, and to enable the reviewing court to determine if prejudicial error resulted from the exclusion of the proffered testimony." *Garcia v. State,* Wyo., 667 P.2d 1148, 1155 (1983).

Quoted in *Sims,* 751 P.2d at 362 (citations omitted).

In this case, the Lawrences, through an offer of proof at trial and their appellate brief, assert that evidence relating to the financial problems of the Wyoming Production Credit Association and Production Credit causing the restructuring of those associations was relevant because such changes resulted in the unjust foreclosure of numerous loans in order to collect assets and money to "shore up" the farm credit system in other areas. The Lawrences reason that, in order to save the farm credit system, loan standards in the areas of credit criteria and refinancing were changed, which resulted in the bad faith foreclosure of numerous loans by Production Credit and/or Farm Credit, including their own. The Lawrences further assert that capital was transferred to other offices in bad faith causing the Wyoming Production Credit Association to have insufficient moneys to loan to its patrons in its own area.

While we recognize that such evidence may be appropriate for a shareholder's de-

rivative action, we fail to see how this evidence is relevant to the subject matter involved in this case. Production Credit and Farm Credit were entitled to foreclose on the respective promissory notes, security agreements, and mortgage when each of the promissory notes became due. Production Credit and Farm Credit had no duty to lend any additional moneys to the Lawrences. Production Credit and Farm Credit have the right to operate their businesses as they themselves deem proper and in their best business interest within their own corporate hierarchy of officers, directors, employees, and shareholders. See generally the Wyoming Business Corporation Act, W.S. 17–1–101 through 17–1–1102. We hold that the trial court acted properly when it excluded evidence regarding the apparent financial problems of the Wyoming Production Credit Association and Production Credit.

We are sensitive to the plight of the American family farm and ranch and are fully aware that nationwide individuals like each of the Lawrences are losing their land, their homes, their personal property, and, in general, their way of life. We hold that Production Credit and Farm Credit acted properly throughout their dealings with the Lawrences within these regards.

Affirmed in part, reversed in part, and remanded for further proceedings in accordance with this opinion.

URBIGKIT, J., filed an opinion concurring in part and dissenting in part.

URBIGKIT, Justice, concurring in part and dissenting in part.

I concur in the result only to reverse the decision of the trial court relating to wool, sale proceeds and security priority rights in sheep branded X7 and respectfully dissent from any decision to otherwise affirm the directed verdict.[1]

---

1. By dissent circulated June 20, 1987, I would have concurred with the original opinion on the subject of priority claims to the sheep and proceeds. Since that time, a special concurrence was circulated, after which the opinion was

modified to accommodate the thesis of the author of that special concurrence as now withdrawn.

To avoid a delayed publication of the opinion, I would qualify any conclusion in concern that

This court, as did the trial court, achieves an evidentiary conclusion based on conflicting evidence to justify a directed verdict as adverse to the borrower to favor the lender. At issue was the contention of an ongoing agreement for the lender to provide operational capital to the borrowers. As is epidemic in general lending but more tragically in agriculture, the precipitous denial of capital by the lender, and particularly so at a time after a destructive storm resulting in heavy livestock loss, presaged inevitably the foreclosure and probable bankruptcy of the agriculturalist.

To the extent of denied jury resolution on issues of fact clearly to be discerned in the record presented as within broad parameters clearly defined of a lender's cultivated expediency of asserted and anticipated funding, I dissent from the approval of the moralistic and legal default by the lender. Differing from the premier decision on lender liability, *State Nat. Bank of El Paso v. Farah Mfg. Co., Inc.*, Tex.App., 678 S.W.2d 661 (1984), this court substitutes its conclusions within factual disputes "for those of the jury."

> "It is not within the province of the court to interfere with the jury's resolution of conflicts in the evidence or to pass on the weight or credibility of the witness' testimony. [Citations omitted.] Where there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. [Citations omitted.]" *Id.* at 669.

My review of the entire record would provide a conviction that a jury case was first pleaded and then proven in trial evidence. The court now ignores a singular volume of developing cases of lender defaults of oral agreements and course of business arrangements. This is done by applying a strained interpretation to protect the defaulting lender who demands the impossible and feigns surprise when it does not occur. A more realistic and commercially reasonable application of banking principles and mutual responsibilities between borrower and lender is found in *Sahadi v. Continental Illinois Nat. Bank and Trust Co. of Chicago*, 706 F.2d 193, 196 (7th Cir.1983), where summary judgment in favor of the lender was reversed when the federal appellate court recognized:

> "The limitations upon the use of summary judgment are stringent, and we may not affirm the district court's order unless the record reveals the absence of any genuine issue of material fact. Fed. R.Civ.P. 56(c). We cannot agree with the district court that under Illinois law, expressly made applicable in the agreements here, this record presents no issues of material fact requiring a full trial. While outstanding issues of material fact may well exist also in relation to the Sahadis' waiver and breach of 'good faith' claims, we need not reach those questions here and so confine our analysis for the purposes of this appeal to the issues of 'material' breach."

With that court further continuing:

> "The need for a complete factual inquiry into the underlying circumstances and

a simplistic determination of appellees' rights by ownership at purchase may be over-inclusive within the exhaustive precedent for after-acquired assets through a dragnet clause application. In this case it is, for example, recognized in fact that the funds for the purchase came from other lenders to acquire the asset against which appellees attempt to attach a priority security claim. The priority provisions of § 34–21–941, W.S.1977 could be implicated depending on specific circumstances, documentation and events. Other avoiding characteristics included within the generic subject may or may not result from a confined attention to the specific circumstances as may be found in jury verdict.

In order to avoid a delayed publication date, this concurrence is restricted on the issue to the results only and in no way implies a predisposition applicable to legal rules that may be applied upon trial, and specifically, whether the rights to the security are solely determinable by one time bland ownership concepts. The dragnet-anaconda security interest characteristics are complex indeed, as witnessed by *First National Bank, Cortez v. First Interstate Bank, Riverton, Wyo.*, 758 P.2d 1026 (1988), for which rehearing was granted so that the case will be again orally argued. Even with the UCC statutory approval, contested claims to after-acquired property security interest can be found in many scores of hotly contested litigative controversies presenting defenses on at least a half a dozen different bases. Whether any or none apply here, cannot be presently determined on the record and briefing which has resulted from the prior directed verdict now presented in this appeal.

commercial custom is especially acute where, as here, the purportedly breaching party claims that time was not of the essence of the contract. * * *

\* \* \* \* \* \*

"Although we need not reach the question of whether summary judgment may properly be applied to plaintiffs' assertion of waiver and 'good faith,' we hold that such a procedure was an inappropriate short-cut in resolving the necessarily fact-bound, complex question of 'material' breach." *Id.* at 197, 200.

Current violated loan commitment cases with claimed factual issues and jury or bench trial resolution include *Federal Land Bank of Omaha v. Gibbs,* 809 F.2d 493 (8th Cir.1987) (remanded to state court for loan commitment, factual conflict resolution); *Betterton v. First Interstate Bank of Arizona,* 800 F.2d 732 (8th Cir.1986) (UCC duty of good faith as a contractual remedy); *K.M.C. Co., Inc. v. Irving Trust Company,* 757 F.2d 752, 759 (6th Cir.1985) (good faith is implied in every contract and this includes a financing agreement; questions of fact should be resolved by jury decision); *Native Alaskan Reclamation and Pest Control, Inc. v. United Bank of Alaska,* Alaska, 685 P.2d 1211 (1984); *Alaska Statebank v. Fairco,* Alaska, 674 P.2d 288 (1983) (course of dealing between the parties, altered rights established under pre-existing agreements); *Clinton Federal Sav. & Loan Ass'n v. Iowa–Des Moines Nat. Bank,* Iowa App., 391 N.W.2d 712, 719 (1986) (conflict factually between lead and participant lenders on an over-lined loan dispute where testimony regarding the practice in the banking community generally and of the lead lender specifically is relevant and material); *Consolidated Am. Life Ins. Co. v. Covington,* Miss., 297 So.2d 894, 896 (1974) (the trial court was not in error in failing to direct a verdict in favor of the lender); *Shaughnessy v. Mark Twain State Bank,* Mo.App., 715 S.W.2d 944 (1986); *Yankton Production Credit Ass'n v. Larsen,* 219 Neb. 610, 365 N.W.2d 430, 434 (1985) (genuine issues of material fact as to whether the PCA acted in good faith when it refused to loan the amount of

the budgeted loan); and *Pecos Const. Co. v. Mortgage Inv. Co. of El Paso,* 80 N.M. 680, 459 P.2d 842 (1969) (business compulsion as economic duress is actionable). See likewise *Bank of Fairbanks v. Kaye,* 16 Alaska 23, 227 F.2d 566 (9th Cir.1955) (the bank should not accept a new arrangement if not intending to comply with its basic promise as novation by further assurance from third-party payment promise which abrogates any denied right to immediate foreclosure); *Stirling v. Chemical Bank,* 382 F.Supp. 1146, 1153 (S.D.N.Y.1974), aff'd 516 F.2d 1396 (2nd Cir.1975) (common law fraud from false representations that outstanding loans would not be called and further loans would be made); *First Nat. Bank in Libby v. Twombly,* Mont., 689 P.2d 1226 (1984) (jury issue of breach of statutory obligations to act in good faith); and *Nevada Nat. Bank v. Huff,* 94 Nev. 506, 582 P.2d 364 (1978) (course of conduct between parties as jury issue to impose duty on lender). Compare *Northwestern Nat. Bank of Great Falls v. Weaver–Maxwell, Inc.,* Mont., 729 P.2d 1258, 1262 (1986) (where on reversal of jury verdict, appellate court said that the trial court *did not* leave fact finding to the jury, as it should leave the factual determinations of the nature of the agreement to the jury). Also to be compared is *Rigby Corp. v. Boatmen's Bank and Trust Co.,* Mo.App., 713 S.W.2d 517, 527 (1986) (in discussion of good faith from reasonable commercial standards of the trade involved to characterization as honesty in fact). See Ebke and Griffin, *Lender Liability to Debtors: Toward a Conceptual Framework,* 40 Sw. L.J. 775 (1986) as an article that provides a comprehensive and thoughtful review.

Timothy P. Reardon, in current law journal analysis, Comment, *Wisconsin Lenders Beware: Borrowers are Striking Back With Lender Liability,* 71 Marq.L.Rev. 376 (1988), analyzes as common law theories of lender liability of fraudulent misrepresentation, duress and tortious enterprise as found from *State Nat. Bank of El Paso v. Farah Mfg. Co., Inc.,* supra, 678 S.W.2d 661 and the more directly implemented requirement of good faith and fair dealing as including refusal to advance funds and ac-

celeration of maturity. Applicability to the relationship of these present litigants is self-evident in pleading and evidence.

This court now creates a mechanism, which the Wyoming legislature has refused to provide, that will invalidate substantive contracts to provide credit effectuated by oral agreement when justified and memorialized through a course of business relationships. Additionally, the court ignores the UCC covenant of good faith which is encompassed within § 34–21–122, W.S. 1977; § 34–21–120(a)(xix), W.S.1977; and § 34–21–127, W.S.1977. See *K.M.C. Co., Inc. v. Irving Trust Company,* supra (which may be considered as a premier case in persuasive authority); *Rigby Corp. v. Boatmen's Bank and Trust Co.,* supra; *First Nat. Bank in Libby v. Twombly,* supra; *Yankton Production Credit Ass'n v. Larsen,* supra; and Summers, *The General Duty of Good Faith—Its Recognition and Conceptionalization,* 67 Cornell L.Rev. 810 (1982).

In approval of the directed verdict against the agriculturalist as borrower, the court accepts the posture that what really happened is unimportant unless specifically refined in explicit written agreement, *as a matter of law,* in avoidance of a factual issue resolution by the constitutional fact finding jury. Consequently, the court converts what was in reality an issue of fact review (Stage 6 of *Cordova v. Gosar,* Wyo., 719 P.2d 625 (1986)) into a decision as a matter of law without regard for the materiality of conflicting evidence. *Shauers v. Board of County Com'rs of Sweetwater County,* Wyo., 746 P.2d 444 (1987); *Intermountain Brick Co. v. Valley Bank,* Wyo., 746 P.2d 427 (1987); *Atlas Const. Co. v. Slater,* Wyo., 746 P.2d 352 (1987); *Yene v. Stassinos,* Wyo., 730 P.2d 791 (1986).

In amended answer and counterclaim of 24 pages with 38 paragraphs for answer and 22 for counterclaim, appellants, as borrowers, allege theories of recovery or defense which included: (1) breach of agreement of lender when borrowers obtained a separate loan for application on the debt with concurrent agreement that of the repaid $219,000, that $100,000 would be available for restocking and livestock purchases; (2) agreement and line of credit as operational relationship between the parties predating the annual renewal periods of the promissory debt instruments in total of two million dollars, of which only $1,045,000 was advanced with concurrent breach by lender of this line of credit agreement when additional advances from the fund would not be provided; (3) course of business, custom and procedure between the parties for operational financing, which had existed since the early 1960's, was breached by lender in demanded payment and consequent foreclosure; (4) harassment of a separate lender, First Interstate Bank of Buffalo, with intent to "interfere with and damage the [appellants'] banking relationship" with the other lender; (5) although completely secured, lender instituted foreclosure which was "not reasonable, but is capricious, irresponsible, tortious, malicious, and an intentional effort to injure and damage these Defendants;" (6) denied credit resources which should have been available for "young and beginning ranchers" pursuant to 12 C.F.R. § 614.4165 (1–1–85 edition); (7) denied cooperation with the Wyoming State Farm Loan Board as consequently vetoing acquisition of an emergency replacement lost livestock loan which would have provided operational capital and livestock; and (8) denied cooperation with the Farmers Home Administration and Small Business Administration by rejection of a nondisturbance agreement as vetoing funding which "could have discharged all of the debt of the Wyoming Production Credit Association."

Any realistic appraisal of this 12 volume, exhaustively exhibited record reveals little doubt that the lender denials, rejections and vetoes deliberately and intentionally occurred. The issue presented came with a defensive concept to the contract and tort phase of the lender's legal justification. Since clear factual issues were comprehensively developed within the extended record, this court now supports the directed verdict and supplies that justification by the parol evidence rule. That application is totally misplaced in the contours of alleged lending breaches encompassing tortious and contract violations. These cases are of a nature where the facts and events are

normally derived from a course of business, oral agreements and understanding between parties who have long been associated in a history of financing. See discussion of justification, Annotation, *Prima Facie Tort*, 16 A.L.R.3d 1191 (1967).

The permissive "may," as ascribed high weight by majority opinion, is in my concept and currently developing lender liability precedent subject to definition by the actual understanding between the parties which was clearly conflicting in factual presentation in trial evidence before the directed verdict was granted. The subject of the combination of disparity of information and misplaced trust as considered in *Commercial Nat. Bank of Peoria v. Federal Deposit Ins. Corp.*, 131 Ill.App.3d 977, 87 Ill.Dec. 107, 476 N.E.2d 809 (1985), is equally involved here. I would also find a jury issue of justified reliance under the circumstance. *Sanchez–Corea v. Bank of America*, 38 Cal.3d 892, 215 Cal.Rptr. 679, 701 P.2d 826 (1985).

In this snow blizzard effectuated case by loss of sheep in the spring storm of 1984, failure of credit for replacement was axiomatic in successive loan default and mortgage foreclosure. My principal objection to the court's decision is it confines the course of business status of the business relationship, which occurred over years, to the particularized terms of the annualized loan security documents. Those documents were the result of the transactional arrangement of the parties and were not intended to create the ongoing long-term understanding between the parties. Obviously, if the borrower had known that Wyoming Production Credit Association would jump ship with availability of capital in the event of a weather disaster, then many

years earlier the borrower would have found an alternative source of financing in order to minimize the constancy of danger from a "pulled plug." The lending agreement between these parties was derived from understanding in express statements arising through the years of mutual business association as lender and borrower. Denial of a jury trial analysis is terribly unjustified. With the facts in dispute, "the language used and the meaning to be given it, were questions of fact for the jury." *Coston v. Adams*, 203 Okl. 605, 224 P.2d 955, 961 (1950).

The evidentiary conflict and basic factual disagreement on the central concern of mutual understanding for a line of credit is only sidestepped by ignoring substantive oral evidence and valid inferences to be derived from the nature of the conduct of the enterprise. In substitute, the court wrongly applies the limiting stricture of parol evidence applied to a part of the evidence which clearly, from this record, does not include the entirety of the understanding and the basic facts of the business transaction.

The obdurate and unexpected rejection of continued financing responsibility by the Wyoming Production Credit Association was exasperated as shown by the record in failure to even cooperate with the borrower so that substitute credit might be acquired. This lender was not to be a port in any storm but rather an abyss when turbulence was encountered.[2]

In conclusion of their law journal article, Ebke and Griffin surmised:

"The great lesson, we think, that can be drawn from the growing body of case law of lender liability is a modern version

**2.** Appellants, in counterclaim, rather clearly pleaded a tort claim cause of action within the emergency perspective of the prima facie tort. Annotation, *Prima Facie Tort*, 16 A.L.R.3d 1191, supra as a "rather narrowly restricted specific remedy, involving otherwise lawful conduct not giving rise to an action for some other tort, maliciously intended to harm the complainant and causing 'special' damage, without justification." Breach of the UCC covenant of good faith and execution of the prima facie tort are reciprocal remedies. One in contract and the other in tort that rationally result from the same character conduct. Compare *First Nat. Bank in*

*Libby v. Twombly*, supra, 689 P.2d 1226 with *Betterton v. First Interstate Bank of Arizona*, supra, 800 F.2d 732 and *Rigby Corp. v. Boatmen's Bank and Trust Co.*, supra, 713 S.W.2d 517. Ebke and Griffin, supra, at 799:

"Under the prima facie tort theory a lawful act unjustifiably performed with an intent to harm another is unlawful and makes the actor liable for damages. A cause of action under the prima facie tort theory may not be brought, however, if the conduct is actionable under an existing, well-defined cause of action. The prima facie tort theory is functionally and theoretically distinguishable from the

of the ancient Greek ideal [as] (balance), balance between a lender's interest in assuring repayment and the debtor's interest in freedom from undue interference by the creditor. Where to draw the line, of course, cannot be stated in terms of an abstract rule or principle." Ebke and Griffin, supra, at 816.

Clearly here, however, the trial court and now this court draws the line without currently available precedential justification and with complete unfairness in theory or conflicting fact to the damaged and devastated borrower.

Consequently, I dissent and would reverse the judgment of foreclosure and the directed verdict on appellants' claims and remand the case for the requested jury trial.

actionable implied duty of good faith and fair dealing in that it sounds in tort while the duty of good faith and fair dealing sounds in contract and tort. The theories are, however, indistinguishable in application. Both theories require the fact finder to assess the mental state of the actor in the absence of clearly defined standards of unacceptable conduct. The prima facie tort theory, as well as the duty of good faith and fair dealing, is merely 'a philosophical effort to state all tort law in a single sentence rather than an effort to state a meaningful principle.'". [Footnotes omitted.] See comparable tort of unreasonable collection efforts with resulting jury verdict damage award, *Bank of North America v. Bell*, Tex.Civ. App., 493 S.W.2d 633 (1973).